Barry I. Levy
Michael A. Sirignano
Michael Vanunu
Philip P. Nash
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and       Docket No.:_____ (        )
GEICO CASUALTY COMPANY,

                         Plaintiffs,

                                          **Plaintiff Demands a Trial by Jury**

      -against-

THOMAS CUOMO, ROY DEVRIES,
STRAC MEDICAL L.L.C., and JOHN DOE
DEFENDANTS 1-10,

                         Defendants.
------------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## INTRODUCTION

      1.     GEICO brings this action to recover more than $595,000.00 the Defendants have

wrongfully obtained from GEICO and to terminate the Defendants' on-going fraudulent scheme

of exploiting the New York "No-fault" insurance system by submitting millions of dollars in

charges relating to medically unnecessary, illusory, and otherwise non-reimbursable pieces of durable medical equipment ("DME"), primarily in the form of so-called mechanical deep vein thrombosis ("DVT") prophylaxis pumps ("DVT Device"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds").   As discussed in this complaint, the DVT Devices and other DME were provided and billed without regard for genuine patient care, but rather, for the Defendants financial benefit and as a result of unlawful financial arrangements between the Defendants and others.

2.      Strac Medical, L.L.C. ("Strac") is a retailer that primarily rents DVT Devices, devices which inflate a leg cuff to compresses the leg to help prevent DVT to bed-bound patients. Strac also provides other DME, including canes as well as shoulder and knee orthoses.  Strac is owned by Thomas Cuomo ("Cuomo") and Roy DeVries ("DeVries") (collectively with Strac, the "Defendants").  Cuomo and DeVries devised a scheme in conjunction with others who are not readily identifiable to GEICO to obtain prescriptions from various healthcare providers (the "Referring Providers") and ambulatory surgical centers ("Surgical Centers") to submit large volumes of billing to GEICO and other New York automobile insurance companies for purportedly supplying DVT Devices and other DME through Strac that were illusory, medically unnecessary, and otherwise not reimbursable.

3.      Based upon prescriptions for DVT Devices and other DME purportedly issued by the Referring Providers, the Defendants allegedly rented DVT Devices and provided other DME at multiple Surgical Centers to Insureds after the Insured underwent ambulatory surgery.

4.      GEICO seeks to recover more than $595,000.00 that has been wrongfully obtained by the Defendants and, further, seeks a declaration that it is not legally obligated to pay

reimbursement of more than $1,600,000.00 in pending No-Fault insurance claims that have been

submitted on behalf of the Defendants because:

    (i)    The Defendants billed GEICO for DVT Devices and other DME when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

    (ii)    The Defendants billed for DME purportedly provided by Strac, when Strac never provided the DME to the Insureds;

    (iii)    The Defendants billed GEICO for providing DVT Devices and other DME to Insureds as a result of unlawful financial arrangements with others at the Surgical Centers who are not presently identifiable;

    (iv)    The Defendants billed GEICO for DVT Devices that were not medically necessary and provided – to the extent that any DVT Devices were provided – pursuant to prescriptions issued by the Referring Providers because of predetermined fraudulent protocols, which were solely to financially enrich the Defendants and others not presently known rather than to treat the Insureds; and

    (v)    To the extent that any equipment was provided to Insureds, the bills for DVT Devices and other DME submitted to GEICO by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the DVT Devices.

5.    The Defendants fall into the following categories:

    (i)    Defendant Strac is a New Jersey corporation that purports to purchase DME from wholesalers, purports to provide DVT Devices to automobile accident victims, and bills New York automobile insurance companies, including GEICO, for providing DVT Devices.

    (ii)    Defendants Cuomo and DeVries own, operate, and control Strac and use Strac to submit bills to GEICO and other New York automobile insurance companies for DVT Devices purportedly provided to automobile accident victims.

    (iii)    John Doe Defendants 1-10 are presently not identifiable but are associated with the Surgical Centers, and who have conspired with the Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers.

6.    As discussed below, the Defendants have always known that the claims for the

DVT Devices submitted to GEICO were fraudulent because:

(i)     The bills for DVT Devices and other DME submitted by the Defendants to GEICO knowingly misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the DVT Devices and other DME by the New York City Department of Consumer and Worker Protection;

(ii)    The Defendants fraudulently billed for providing DVT Devices to Insureds that they never provided. Instead, to the extent that any Insureds were provided with DVT Devices, they were provided by the Surgical Centers which is included in the Surgical Center fees charged to GEICO;

(iii)   The DVT Devices and other DME were provided – to the extent that any equipment was provided – based upon prescriptions received as a result of unlawful financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for No-Fault insurance reimbursement in the first instance;

(iv)    The prescriptions for DVT Devices were not medically necessary and the DVT Devices were provided – to the extent that any DVT Devices were provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds; and

(v)     To the extent that any DME was provided to Insureds, the bills for DME submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the DME.

7.      As such, the Defendants do not now have – and never had – any right to be compensated for the DVT Devices and other DME billed to GEICO through Strac.

8.      The chart attached hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to Strac's fraudulent scheme.

9.      The Defendants fraudulent scheme involving Strac against GEICO and the New York automobile insurance industry began no later than July 2018 and the scheme has continued uninterrupted since that time.

10.     As a result of the Defendants' fraudulent schemes, GEICO has incurred damages of more than $595,000.00.

**The Parties**

**I.      Plaintiffs**

11.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.     Defendants**

12.     Defendant Strac is a New Jersey corporation with its principal place of business in Bedminster, New Jersey.  Strac was incorporated on July 3, 2018, is owned, operated, and controlled by DeVries and Cuomo, and has been used by DeVries and Cuomo, with the assistance of others not presently identifiable by GEICO as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers. Strac is not and has never been registered to conduct business in the State of New York.

13.     Defendant Cuomo resides in and is a citizen of New York. Cuomo is not and has never been a licensed healthcare provider. Cuomo, together with DeVries, owns, operates, and controls Strac, and entered into agreements with others who are not presently identifiable for Strac to obtain prescriptions for the DVT Devices and other DME from the Surgical Centers that were purportedly issued by the Referring Providers.

14.     Defendant DeVries resides in and is a citizen of New Jersey. DeVries is not and has never been a licensed healthcare provider. DeVries, together with Cuomo, owns, operates, and

controls Strac, and entered into agreements with others who are not presently identifiable for Strac to obtain prescriptions for the DVT Devices and other DME from the Surgical Centers that were purportedly issued by the Referring Providers.

15.     The Defendants were previously sued by Allstate Insurance Company in a suit alleging a no-fault insurance scheme similar to the scheme described in this complaint.  The case reached a confidential settlement in February 2022.  See, Allstate Ins. Co., et al. v. Strac Medical L.L.C., et al., 1:21-cv-03539(DG)(MMH) (E.D.N.Y. 2021).

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

17.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

18.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

20.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

      **A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

21.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

22.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

23.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

24.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

25.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

26.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

> (Emphasis added).

27.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with

licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law.

28.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

29.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP"), which was previously referred to as the New York City Department of Consumer Affairs.  See NYC Admin. Code §20-426.

30.     For DME companies located outside of the City of New York, if they derive more than $4,000.00 in annual gross receipts or income from selling or renting DME to persons residing within the City of New York, or if more than 10% of their annual gross income of the business is from selling/renting products to persons residing in the City of New York, then the company needs a license with the DCWP.

31.     New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

32.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain

of the licensee or of a third party". <u>See</u> N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

33.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

34.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

35.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto . . ., commits a fraudulent insurance act, which is a crime.

36.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Regulations Governing No-Fault Benefits for DME**

37.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

38.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators, electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, cervical traction units, and devices to prevent deep vein thrombosis.

39.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

40.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York Fee Schedule.

41.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated

10

fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

42.     As it relates to DME, the New York Fee Schedule sets forth the maximum charges as follows:

(a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2.

43.     As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

44.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

45.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning and assigning Healthcare Common Procedure Coding System ("HCPCS") Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

46.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its <u>Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines</u> ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

47.     Where a specific DME item does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the <u>lesser</u> of: (i) 150% of the acquisition cost to the provider; <u>or</u> (ii) the usual and customary price charged to the general public.

48.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." <u>See</u> New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

49.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items and the HCPCS Codes are not within the Medicaid DME Procedure Codes, the definitions for set forth by Palmetto control to determine whether an item of DME qualify for reimbursement under a specific HCPCS Code.

## II.     <u>The Defendants' Fraudulent Schemes</u>

### A.     **Overview of the Defendants' Fraudulent Schemes**

50.     Beginning in or about 2018, DeVries and Cuomo conceived and implemented a complex fraudulent scheme in which they would use Strac as a vehicle to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits, which the Defendants were never entitled to receive.

51.     DeVries and Cuomo used Strac to directly obtain No-Fault benefits and maximize the amount of No-Fault Benefits they could obtain by submitting fraudulent bills to GEICO and other automobile insurers seeking reimbursement for DVT Devices and other DME.

52.     Between July 2018 and the present, the Defendants submitted more than $3.1 million in fraudulent claims to GEICO seeking reimbursement for DVT Devices and other DME. To date, the Defendants have wrongfully obtained more than $595,000.00 from GEICO, and there are more than $1,600,000.00 in additional fraudulent claims that have yet to be adjudicated but for which the Defendants continue to seek payment from GEICO.

53.     The Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for DVT Devices and other DME purportedly issued by the Referring Providers because of improper agreements with third-party individuals at the Surgical Centers who are not presently identifiable.

54.     Strac hired independent contractors to solicit Surgical Centers to use Strac as their DVT Device supplier.

55.     The Defendants then supplied DVT Devices to multiple Surgical Centers, including : (i) Ambulatory Surgery Center of East Tremont Medical Center ("East Tremont ASC") located in Bronx, New York; (ii) North Shore Surgi-Center ("North Shore ASC") located in Smithtown, New York; (iii) Avicenna Ambulatory Surgery Center ("Avicenna ASC") located in

Bronx, New York; (iv) Triboro ASC ("Triboro ASC") located in Bronx, New York; and (v) Global Surgery Center ("Global ASC") located in Oradell, New Jersey.

56.     Strac then provided Surgical Centers with DVT Devices for use during an Insured's stay at the Surgical Center following their minimally invasive arthroscopic procedures.  The DVT Devices remained with the Surgical Center and were used by multiple Insureds.

57.     To the extent that DVT Devices were provided to Insureds during their time at the Surgical Centers, the DVT Devices were provided by the Surgical Centers without any involvement by the Defendants.

58.     The independent contractors hired by Strac provided the Surgical Centers with copies of a "Written Order/Letter of Medical Necessity/Prescription" form created for Strac.

59.     The "Written Order/Letter of Medical Necessity/Prescription" contained sections to assess a patient's risk for developing a DVT, bleeding risk factors, and a section for other DME products to be supplied and billed by Strac, including knee orthoses, shoulder orthoses, and canes.

60.     As part of this scheme, the Defendants obtained completed copies of these "Written Order/Letter of Medical Necessity/Prescription" forms, purportedly issued by the Referring Providers who performed the minimally invasive arthroscopic procedures on the Insureds at a Surgical Center.

61.     The Defendants received these "Written Order/Letter of Medical Necessity/Prescription" forms, purportedly issued by the Referring Providers as part of the unlawful financial arrangements with third parties who are not presently identifiable at the Surgical Centers, directly from the Surgical Centers.

62.     Once the Defendants received the prescriptions for DVT Devices, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for DVT Devices that were purportedly provided to the Insureds during their stay at the Surgical Center.

63.     The Defendants would also submit, on the same bill, charges for providing Insureds with other DME, typically a shoulder orthosis, knee orthosis, or a cane.

64.     By submitting bills to GEICO seeking No-Fault Benefits for DVT Devices, the Defendants indicated that they provided Insureds with DVT Devices.

65.     However, Strac never provided the DVT Devices to Insureds as the DVT Devices were instead provided by the Surgical Center as part of the Insured's operative and post-operative care, to the extent they were provided at all.

66.     By submitting bills to GEICO seeking No-Fault Benefits for DVT Devices, the Defendants also indicated that the DVT Devices were medically necessary as determined by a healthcare provider licensed to prescribe DME.

67.     However, none of the charges identified in Exhibit "1" were for medically necessary DVT Devices because – for example, and as will be discussed further below – the prescriptions for DVT Devices were issued to Insureds who underwent minimally invasive outpatient arthroscopic procedures and were ambulatory following the surgery.

68.     In furtherance of their scheme to defraud GEICO and other automobile insurers, the Defendants submitted bills for DVT Devices and other DME that that grossly inflated the permissible reimbursement rate that they could receive.

69.     At all times, the Defendants engaged in fraudulent schemes to bill GEICO for No-Fault benefits that they were never entitled to receive because: (i) the Defendants operated in violation of local licensing laws; (ii) the Defendants obtained prescriptions as a result of unlawful

financial arrangements with others; (iii) the Defendants billed for DVT Devices they never provided to Insureds; (iv) the bills by the Defendants were for medically unnecessary DVT Devices; and (v) the bills by the Defendants were for DVT Devices and other DME at grossly inflated reimbursement rates.

### B. Strac's Failure to Comply with Local Licensing Provisions

70. As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must receive a Dealer in Products License by the City of New York.

71. Strac purportedly supplied DVT Devices and other DME to Insureds located within the City of New York.

72. For the Defendants to lawfully provide DVT Devices and other DME to the Insureds within the City of New York, Strac was required to obtain a Dealer in Products License from the City of New York.

73. However, Strac never sought or obtained a Dealer in Products License, and was therefore, not lawfully permitted to sell, rent, fit, or adjust any DVT Devices or other DME for Insureds within the City of New York.

74. As a result, the Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME supplier to Insureds within the City of New York without a valid Dealer in Products License.

75. In each of the claims identified in Exhibit "1", the Defendants fraudulently misrepresented that they complied with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds when the Defendants were never eligible to collect

16

No-Fault Benefits for New York based Insureds because Strac did not obtain a Dealer in Products License.

### C.     Fraudulent Billing for DME Never Provided by Strac

76.     In each of the bills submitted to GEICO that are identified in Exhibit "1" for DVT Devices, the Defendants fraudulently represented to GEICO that they provided the DVT Devices to Insureds and were entitled to collect No-Fault Benefits.

77.     However, Strac never actually provided any DVT Devices to the Insureds, including those identified in Exhibit "1".

78.     In fact, Strac never had any communication or conversations or other legitimate arms-length transaction with any of the Insureds relating to the DVT Devices.

79.     Instead, to the extent that the DVT Devices were provided to Insureds, they were provided by the Surgical Centers as part of the ambulatory surgery and post-operative care provided at the Surgical Centers.

80.     Strac's relationship was solely with the Surgical Centers, wherein they supplied the Surgical Centers with some of the DVT Devices that were purportedly used by the Surgical Centers for their operative and post-operative treatment of Insureds by providing DVT Devices before the Insureds were discharged from the Surgical Center.

81.     The DVT Devices were not provided to the Insureds to take home and were purportedly only used by Insureds while they were at a Surgical Center, to the extent they were used at all.

82.     In each and every case, the Surgical Centers billed GEICO for their "facility fee" associated with the ambulatory surgeries.

83.     This facility fee is calculated using Enhanced Ambulatory Patient Groups ("EAPG"), which is determined based on the type of procedure performed and is designed to include all types of resources used during an Insured's visit to a Surgical Center, including but not limited to, professional services, pharmaceuticals, supplies, ancillary tests, equipment utilization, use of rooms, and treatment time.

84.     Further, the Workers' Compensation Board responded to a question on their website regarding reimbursement for DME supplied at an ambulatory surgery center, in pertinent part, "All DME items used…at an ambulatory surgery center…are included in EAPG methodology reimbursement."

85.     Following an Insured's ambulatory surgery at a Surgical Center, each of the Surgical Centers submitted a bill to GEICO containing a facility fee which, based on the EAPG methodology, included all supplies and equipment utilized during the Insured's treatment at the Surgical Center, such as the DVT Devices.

86.     Even though the Surgical Centers provided DVT Devices to the Insureds as part of the operative and/or post-operative treatment and billed GEICO for their use as part of the facility fee, Strac obtained prescriptions for DVT Devices in the Insureds' names due to the unlawful financial relationship between Strac and the John Doe Defendants who were associated with the Surgical Centers and/or the Referring Providers.

87.     Using the prescriptions that they obtained from the Surgical Centers, Strac also billed GEICO for purportedly providing Insureds with a one-day rental of DVT Devices at the Surgical Centers, when the DVT Devices were never provided by Strac.

88.     At the same time the Surgical Centers billed GEICO for their facility fee that included the use of the DVT Device, Strac separately billed GEICO for purportedly providing DVT Devices to Insureds for their use at the Surgical Center prior their discharge.

89.     For example:

(i)     On October 10, 2019, an Insured named LH was purportedly involved in a motor vehicle accident. On August 29, 2022, LH underwent an arthroscopic procedure on their right knee at East Tremont ASC. East Tremont ASC submitted a bill to GEICO for $12,057.50 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to LH on August 29, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to LH at East Tremont ASC on August 29, 2022;

(ii)    On March 3, 2020, an Insured named DR was purportedly involved in a motor vehicle accident. On August 1, 2022, DR underwent an arthroscopic procedure on their left shoulder at East Tremont ASC. East Tremont ASC submitted a bill to GEICO for $17,046.60 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to DR on August 1, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to DR at East Tremont ASC on August 1, 2022;

(iii)   On September 8, 2021, an Insured named HH was purportedly involved in a motor vehicle accident. On December 20, 2021, HH underwent an arthroscopic procedure on their right knee at Global ASC. Global ASC submitted a bill to GEICO for $7,995.42 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to HH on December 20, 2021. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to HH at Global ASC on December 20, 2021;

(iv)    On November 2, 2021, an Insured named WH was purportedly involved in a motor vehicle accident. On January 21, 2022, WH underwent an arthroscopic procedure on their right shoulder at North Shore ASC. North Shore ASC submitted a bill to GEICO for $10,982.31 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to WH on January 21, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to WH at North Shore ASC on January 21, 2022;

(v)     On November 15, 2021, an Insured named DSJ was purportedly involved in a motor vehicle accident. On January 20, 2022, DSJ underwent an arthroscopic procedure on their right elbow at Global ASC. Global ASC submitted a bill to GEICO for $11,877.77 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to DSJ on January 20, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to DSJ at Global ASC on January 20, 2022;

19

(vi)     On November 17, 2021, an Insured named JHC was purportedly involved in a motor vehicle accident. On February 8, 2022, JHC underwent an arthroscopic procedure on their left shoulder at Global ASC. Global ASC submitted a bill to GEICO for $10,677.77 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to JHC on February 8, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to JHC at Global ASC on February 8, 2022;

(vii)    On February 22, 2022, an Insured named TRV was purportedly involved in a motor vehicle accident. On November 17, 2022, TRV underwent an arthroscopic procedure on their right shoulder at North Shore ASC. North Shore ASC submitted a bill to GEICO for $9,517.40 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to TRV on November 17, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to TRV at North Shore ASC on November 17, 2022;

(viii)   On March 17, 2022, an Insured named LC was purportedly involved in a motor vehicle accident. On September 29, 2022, LC underwent an arthroscopic procedure on their left shoulder at North Shore ASC. North Shore ASC submitted a bill to GEICO for $13,641.37 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to LC on September 29, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to LC at North Shore ASC on September 29, 2022;

(ix)     On May 30, 2022, an Insured named AS was purportedly involved in a motor vehicle accident. On August 22, 2022, AS underwent an arthroscopic procedure on their left shoulder at East Tremont ASC. East Tremont ASC submitted a bill to GEICO for $19,680.44 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to AS on August 22, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to AS at East Tremont ASC on August 22, 2022; and

(x)      On June 3, 2022, an Insured named JN was purportedly involved in a motor vehicle accident. On August 15, 2022, JN underwent an arthroscopic procedure on their right shoulder at East Tremont ASC. East Tremont ASC submitted a bill to GEICO for $19,680.44 for the use of their Surgical Center, including the facilities, supplies, and equipment provided to JN on August 15, 2022. Separately, Strac submitted a bill to GEICO seeking $2,995.00 for purportedly providing a DVT device to JN at East Tremont ASC on August 15, 2022.

90.     These are only representative examples. Every time that Strac submitted a bill to GEICO for purportedly providing a DVT Device to an Insured, a Surgical Center also submitted a bill to GEICO for a facility fee that included providing the Insureds with the use of a DVT Device for post-operative treatment at the Surgical Center prior to the Insureds' discharge.

91. In fact, in all the claims identified in Exhibit "1," the Defendants falsely represented that they were the one that provided DVT Devices to the Insureds when they never had any involvement with the Insureds and were therefore ineligible to collect No-Fault Benefits in the first instance.

### D. The Defendants' Unlawful Financial Arrangements

92. In order to obtain access to Insureds so the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable at the Surgical Centers where prescriptions for DVT Devices and other DME were provided to the Defendants in exchange for financial consideration.

93. Since Strac's inception, the Defendants engaged in unlawful financial arrangements with others who are not presently identifiable at the Surgical Centers to obtain prescriptions for DVT Devices purportedly issued by the Referring Providers. These schemes allowed the Defendants to submit hundreds of claims for purportedly renting DVT Devices to GEICO and other New York automobile insurers in New York.

94. The Defendants were able to engage in unlawful financial arrangements to obtain prescriptions for DVT Devices and other DME by using independent contractors to solicit the John Doe Defendants associated with the Surgical Centers to ensure that prescriptions for the rental of DVT Devices were generated for Insureds and then routed directed to Strac.

95. The Defendants then engaged in unlawful financial arrangements with the John Doe Defendants at the Surgical Centers, either directly or via the independent contractors, in order to procure prescriptions for DVT Devices, along with other DME.

96.     In virtually all the claims identified in Exhibit "1", the Defendants billed GEICO for purportedly providing Insureds with DVT Devices based upon prescriptions purportedly issued by Referring Providers after the Referring Providers performed surgical procedures on Insureds at the Surgical Centers.

97.     In keeping with the fact that the prescriptions for DVT Devices were the result of unlawful financial arrangements between the Defendants and others who are not presently identifiable at the Surgical Centers, as explained in more detail below, the prescriptions for DVT Devices were not medically necessary, were provided pursuant to predetermined protocols, and would not be provided by legitimate healthcare providers under identical circumstances.

98.     In all of the claims identified in Exhibit "1," the Defendants falsely represented that DVT Devices and other DME was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

### E.     The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols

99.     In addition to the Defendants' unlawful financial arrangements, the Defendants conspired with others who are not presently identifiable at the Surgical Centers to obtain medically unnecessary prescriptions for the rental of DVT Devices, rather than to treat or otherwise benefit the Insureds.

100.    The prescriptions for DVT Devices that were purportedly issued to the Insureds identified in Exhibit "1" were issued pursuant to predetermined fraudulent protocols that were established by the Defendants and others who are not presently identifiable at the Surgical Centers, not because the DVT Devices were medically necessary for each Insured based upon their individual symptoms or presentations.

101.    In all of the claims identified in Exhibit "1", virtually all of the Insureds were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

102.    Concomitantly, almost none of the Insureds identified in Exhibit "1", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

103.    In keeping with the fact that the Insureds identified in Exhibit "1" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

104.    To the extent that the Insureds in the claims identified in Exhibit "1" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then sent on their way with a diagnosis no more serious than a minor soft tissue injury such as a sprain or strain.

105.    However, despite the fact that virtually all of the Insureds identified in Exhibit "1" were involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subject to similar treatment including treatment by an orthopedic surgery, undergoing arthroscopic surgeries at the Surgical Centers, and obtaining prescriptions for DVT Devices from the Referring Providers.

106.    No legitimate physician, other licensed healthcare provider, or professional entity would permit, implement, or medically justify the fraudulent protocols described below to proceed under his, her, or its auspices.

107.     In general, the Defendants obtained prescriptions for medically unnecessary DVT

Devices issued by the Referring Providers under the following pattern:

(i)      the Insured would arrive at a multi-disciplinary medical office that seeks a high
         volume of No-Fault insurance patients for treatment subsequent to a motor vehicle
         accident;

(ii)     the Insured would be seen by a physician, chiropractor, acupuncturist, physician's
         assistant, or nurse practitioner, and subsequently undergo multiple therapies,
         including chiropractic and physical therapy;

(iii)    thereafter, the Insured would be referred to the Referring Provider, who is
         orthopedic surgeon, for complaints regarding one or more of the Insureds'
         extremities, such as a shoulder or knee;

(iv)     the Referring Provider would then perform a relatively minor arthroscopic surgical
         procedure on one or more of the Insured's extremities at a Surgical Center; and

(v)      as a result of the surgery, the Referring Provider would provide one or more
         prescriptions for DME, including a prescription for the rental of a DVT Device
         during the Insured's stay at the Surgical Center, which would be directly provided
         to the Defendants.

108.     In reality, the prescriptions for DVT Devices issued to the Insureds were not based

on medical necessity but were part of predetermined fraudulent protocols and without regard to

enhance the Insureds individual ability for post-surgical recovery.

109.     As part of the Defendants' fraudulent scheme, the Defendants created a template

prescription form that was purportedly issued by each of the Referring Providers and used by the

Defendants to support all the charges identified in Exhibit "1".

110.     In a legitimate setting, when a patient injured in a motor vehicle accident undergoes

a minimally invasive surgery, the surgeon would evaluate the patient's individual circumstances

to determine a specific course of post-surgical rehabilitation.

111.     Furthermore, in a legitimate setting, in determining a specific course of post-

surgical rehabilitation, a surgeon may – but does not always – prescribe DME that should aid in

the patient's surgical recovery.

112.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual symptoms or presentation.

113.    Even more, in determining whether to prescribe DME as part of a patient's surgical recovery – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the patient is capable of performing at-home rehabilitative treatment; (ii) whether the patient is capable of undergoing post-operative physical therapy; (iii) whether the DME is likely to help improve the patient's surgical recovery; and (iv) whether the patient is likely to use the DME. In all circumstances, any prescribed DME would always directly relate to each patient's individual presentation for post-surgical recovery.

114.    In also determining whether to prescribe a DVT Device as part of a patient's recovery from arthroscopic surgery – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) the patient's existing conditions and family medical history; (ii) whether the patient will be ambulatory post-surgery; and (iii) whether the patient has any pre-existing ambulatory deficits.

115.    It is extremely improbable – to the point of impossibility – that every Insured identified in Exhibit "1" – who underwent minimally invasive arthroscopic surgical procedures of their shoulder or knee – would ultimately receive the same post-surgical treatment including prescriptions for the same DVT Device despite being differently situated.

116. Every Insured receiving identical prescriptions for DVT Devices would, by extension, mean that all those Insureds had identical presentations in the need for post-surgical DVT Devices.

117. However, pursuant to the predetermined fraudulent protocols implemented by the Defendants and others, the Insureds who underwent an arthroscopic surgical procedure were provided with identical prescriptions for DVT Devices without regard for the medical necessity of the DVT Devices, the Insureds' individual post-surgical presentation, or the Insureds' individual ability for post-surgical recovery.

118. In keeping with the fact that the prescriptions for DVT Devices identified in Exhibit "1" were part of a predetermined fraudulent protocol and not based on medical necessity, every Insured identified in Exhibit "1" – after undergoing an arthroscopic surgical procedure – was provided with identical prescriptions for DVT Devices, regardless of the Insured's post-surgical presentation.

119. In keeping with the fact that the prescriptions for DVT Devices identified in Exhibit "1" were part of predetermined fraudulent protocols and not based on medical necessity, the prescribed DVT Devices did not provide any medical benefit to Insureds.

120. In a legitimate setting, there are only a limited number of circumstances where DVT Devices are medically necessary to aid in a patient's recovery. A DVT Device is a machine that provides compression to the lower extremities to aid in the prevention of DVT.

121. Circumstances where DVT Devices are medically necessary include: (i) patient recovery from in-patient surgical procedures where the patient has limited mobility or is otherwise immobile; (ii) if a patient has a specific documented preexisting ambulatory defect, such as

Parkinson's Disease; or (iii) where there has been a documented reconstructive surgical procedure of the knee which would impact the patient's ability to ambulate post-surgery.

122.    Moreover, in a legitimate setting, DVT Devices are <u>not</u> provided when patients undergo minimally invasive surgical procedures and are ambulatory post-surgery, such as the out-patient arthroscopic surgeries performed at the Surgical Centers by the Referring Providers to the Insureds identified in Exhibit "1."

123.    Therefore, absent a documented pre-existing ambulatory defect, a DVT Device is never medically necessary following a shoulder arthroscopy, like the ones performed by the Referring Providers to many of the Insureds identified in Exhibit "1", as the procedure does not affect a patient's ability to ambulate.

124.    Similarly, absent a documented pre-existing ambulatory defect, a DVT Device is never medically necessary following a knee arthroscopy at an ambulatory surgical facility, like the ones performed by the Referring Providers to many of the Insureds identified in Exhibit "1" at the Surgical Centers.

125.    It is improbable that a legitimate healthcare provider would issue a prescription for a DVT Device to a patient post-arthroscopic surgery when that patient is ambulatory and does not have a documented co-morbidity necessitating the need for a DVT Device.

126.    It is improbable – to the point of impossibility – that a legitimate healthcare provider would issue identical prescriptions for DVT Devices to multiple patients' post-arthroscopic surgery, when the patients are ambulatory and do not have a documented co-morbidity necessitating the need for a DVT Device.

127.    In keeping with the fact that the prescriptions used by the Defendants to support the charges identified in Exhibit "1" were medically unnecessary and obtained pursuant to

predetermined fraudulent protocols, the Defendants created the prescription forms used by the Referring Providers in a way to make the prescriptions for DVT Devices appear legitimate when they were not.

128.   In keeping with the fact that the Defendants fraudulently created the prescription forms used by the Referring Providers to misrepresent the medical necessity of the DVT Devices, the Defendants included a pre-printed statement of medical necessary for the DVT Devices that were false because they were inconsistent with the Insureds' medical records.

129.   In all the prescriptions for the claims identified in Exhibit "1", the prescriptions contained the following statement of medical necessity:

> I have assessed that this patient is at risk of developing DVT.  Because of this risk and limited ambulation, I am prescribing a DVT Prevention Therapy using a pneumatic compression device and 2 Half Leg Calf Cuffs (RT and LT).  In my opinion this is medically necessary and in accordance with standards of medical practice and appropriate treatment for this patient.

130.   By signing the prescription forms created by the Defendants, the Referring Providers represented that for every Insured: (i) they assessed the Insured for the risk of developing a DVT; (ii) the Insured was at risk for DVT; and (iii) the Insured had limited ambulation.

131.   In all of claims identified in Exhibit "1", the statements of medical necessity purportedly signed by the Referring Providers were false and fraudulently misrepresented the Insureds conditions because the Insureds' conditions and surgical history in the statement of medical necessity were inconsistent with the Insureds' medical records.

132.   In a legitimate setting, a healthcare provider would document in a contemporaneously dated medical record, such as an examination report, a surgical record, a pre-operative examination, or post-operative examination, their findings and opinions as it relates to a

patient's risk for developing DVT as described in the "statement of medical necessity" contained on the prescriptions for DVT Devices.

133. Also in a legitimate setting, the failure of a healthcare provider to document in an examination report or other medical record a specific fact or opinion related to a patient's medical history, medical condition, diagnosis, or treatment is evidence that such history, condition, diagnosis, or treatment does not exist.

134. However, and in contrast to the statements of medical necessity contained on the prescriptions for DVT Devices, the Referring Providers' medical records for each Insured did <u>not</u> document that the Insured: (i) was at risk for developing a DVT; (ii) had a limited ability to ambulate, either due to the surgery or due to a medical or pre-existing condition; (iii) could not take pharmacologic agents to aid in prevention of a DVT; (iv) that a DVT Device was being prescribed; or (v) the medical necessity for prescribing a DVT Device.

135. In also keeping with the fact that the Defendants fraudulently created the prescription forms used by the Referring Providers to misrepresent the medical necessity of the DVT Devices, the Defendants included a rubric that fraudulently misrepresented the Insureds were at a "high risk" for developing a DVT after the arthroscopic surgeries from the Referring Providers.

136. The Defendants created a rubric that was intended to misrepresent the Insureds as being at a "high risk" for development a DVT because the rubric did not comport with medical standards.

137. The rubric that the Defendants included in the prescription forms used by the Referring Providers were intended to look like the Caprini Score for Venous Thrombeombolism ("Caprini Score"), which is a legitimate rubric used to evaluate risk factors for post-operative

immobile patients and determine their risk for developing DVT that was first introduced in 2005 and then modified in 2013.

138.    However, and in keeping with the fact that the Defendants intended the rubric on their prescriptions to misrepresent the Insureds as "high risk" for development a DVT, the Caprini Score contained on the Defendants' prescriptions is inconsistent with current medical standards as it was illegitimately altered from the current version of the Caprini Score.

139.    For example, the rubric on the Defendants' prescriptions forms indicate that a patient is at a "moderate risk" for a DVT if they score two points and a "high risk" for a DVT if they have three or more points from the rubric.  The following is an example of the Defendants' prescription forms:



140.    By contrast, in a legitimate Caprini Score rubric, post 2013, a patient is considered "low risk" if they score between one to four points on the rubric and are considered a "moderate risk" if they score five to eight points on the rubric. Only patients who score over nine points on the rubric are considered "high risk" for a DVT.

141.    The Defendants knowingly included an illegitimately altered Caprini Score rubric on their prescriptions, which was used by the Referring Providers, to falsely represent that their charges to GEICO for DVT Devices were medically necessary, when they were not.

142.    In keeping with the fact that the prescriptions for DVT Devices were medically unnecessary and were created to provide a false appearance that the DVT Devices were medically necessary, in a legitimate setting, healthcare providers would not utilize a Caprini Score to determine whether a patient is at risk for a DVT following an arthroscopic out-patient procedure when the patient is ambulatory and does not have a preexisting condition that immobilizes the patient.

143.    In further keeping with the fact that the prescriptions for DVT Devices were not medically necessary and part of a predetermined treatment protocol, no legitimate healthcare provider would attest to the medical necessity of the DVT Devices using an illegitimately altered Caprini Score.

144.    Additionally, and in further support of the fact that the prescriptions for DVT Devices were not medically necessary, the Referring Providers' pre-operative consultation reports, operating reports, or post-operative reports are completely devoid of any medical justification as to why they are deviating from the community standard of care by prescribing DVT Devices to Insureds, and virtually all the Referring Providers' reports fail to mention DVT or DVT Devices entirely.

145.    In all the claims identified in Exhibit "1", the Insureds underwent arthroscopic surgery when they were ambulatory and did not need a Caprini Score evaluation because they did not have any legitimate risk for developing a DVT.

146.    In further keeping with the fact that the prescriptions for DVT Devices were not medically necessary and were provided pursuant to predetermined fraudulent protocols, the DVT Devices purportedly issued by the Referring Providers did not provide any medical benefit to Insureds as the Insureds were all ambulatory after their outpatient arthroscopic surgeries.

147.    Despite the fact that the prescriptions contained illegitimately altered Caprini Score evaluations, that the Insureds identified in Exhibit "1" were ambulatory and would not receive any medical benefit from DVT Devices, and the Insureds medical records did not indicate a need for DVT Devices, virtually all of the Insureds identified in Exhibit "1" were purportedly considered at risk for Venous Thrombeombolism and issued prescriptions for the rental of DVT Devices during their stay at a Surgical Center.

148.    For example:

(i)     On August 8, 2019, an Insured named CS was purportedly involved in a motor vehicle accident. On May 9, 2022, Mark Kramer, M.D. ("Kramer") performed an arthroscopic procedure on CS's left shoulder at East Tremont ASC. On the same date as the arthroscopic surgery, Kramer purportedly issued a prescription in the name of CS for the use of a DVT Device at East Tremont ASC that indicated CS was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(ii)    On September 8, 2021, an Insured named HH was purportedly involved in a motor vehicle accident. On December 20, 2021, Tony Wanich, M.D. ("Wanich") performed an arthroscopic procedure on HH's right knee at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued a prescription in the name of HH for the use of a DVT Device at Global ASC that indicated HH was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(iii)   On November 2, 2021, an Insured named WH was purportedly involved in a motor vehicle accident. On January 21, 2022, Justin Mirza, D.O. ("Mirza") performed an arthroscopic procedure on WH's right shoulder at North Shore ASC. On the same date as the arthroscopic surgery, Mirza purportedly issued a prescription in the name of WH for the use of a DVT Device at North Shore ASC that indicated WH was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(iv)    On November 13, 2021, an Insured named IR was purportedly involved in a motor vehicle accident. On February 10, 2022, Anthony Finuoli, D.O. ("Finuoli") performed an arthroscopic procedure on IR's left shoulder at North Shore ASC. On the same date as the arthroscopic surgery, Finuoli purportedly issued a prescription in the name of IR for the use of a DVT Device at North Shore ASC that indicated IR was at risk of developing a

DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(v)   On November 15, 2021, an Insured named DJ was purportedly involved in a motor vehicle accident. On January 24, 2022, Wanich performed an arthroscopic procedure on DJ's right elbow at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued a prescription in the name of DJ for the use of a DVT Device at Global ASC that indicated DJ was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(vi)   On November 17, 2021, an Insured named JC was purportedly involved in a motor vehicle accident. On February 14, 2022, Wanich performed an arthroscopic procedure on JC's left shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued a prescription in the name of JC for the use of a DVT Device at Global ASC that indicated JC was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(vii)   On December 13, 2021, an Insured named JL was purportedly involved in a motor vehicle accident. On January 24, 2022, Wanich performed an arthroscopic procedure on JL's left shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued a prescription in the name of JL for the use of a DVT Device at Global ASC that indicated JL was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(viii)   On December 16, 2021, an Insured named LW was purportedly involved in a motor vehicle accident. On May 9, 2022, Kramer performed an arthroscopic procedure on LW's right knee at East Tremont ASC. On the same date as the arthroscopic surgery, Kramer purportedly issued a prescription in the name of LW for the use of a DVT Device at East Tremont ASC that indicated LW was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(ix)   On December 18, 2021, an Insured named YY was purportedly involved in a motor vehicle accident. On February 28, 2022, Wanich performed an arthroscopic procedure on YY's left shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued a prescription in the name of YY for the use of a DVT Device at Global ASC that indicated YY was at risk of developing a DVT. The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(x)   On March 1, 2022, an Insured named AU was purportedly involved in a motor vehicle accident. On August 15, 2022, Kramer performed an arthroscopic procedure on AU's left shoulder at East Tremont ASC. On the same date as the arthroscopic surgery, Kramer purportedly issued a

prescription in the name of AU for the use of a DVT Device at East Tremont ASC that indicated AU was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(xi)    On March 3, 2022, an Insured named DR was purportedly involved in a motor vehicle accident. On August 1, 2022, Kramer performed an arthroscopic procedure on DR's left shoulder at East Tremont ASC. On the same date as the arthroscopic surgery, Kramer purportedly issued a prescription in the name of DR for the use of a DVT Device at East Tremont ASC that indicated DR was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(xii)   On March 14, 2022, an Insured named MP was purportedly involved in a motor vehicle accident. On October 6, 2022, Finuoli performed an arthroscopic procedure on MP's right shoulder at North Shore ASC. On the same date as the arthroscopic surgery, Finuoli purportedly issued a prescription in the name of MP for the use of a DVT Device at North Shore ASC that indicated LC was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(xiii)  On March 17, 2022, an Insured named LC was purportedly involved in a motor vehicle accident. On September 29, 2022, Finuoli performed an arthroscopic procedure on LC's left shoulder at North Shore ASC. On the same date as the arthroscopic surgery, Finuoli purportedly issued a prescription in the name of LC for the use of a DVT Device at North Shore ASC that indicated LC was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(xiv)   On May 30, 2022, an Insured named SA was purportedly involved in a motor vehicle accident. On August 22, 2022, Mark Kramer, M.D. ("Kramer") performed an arthroscopic procedure on SA's left shoulder at East Tremont ASC. On the same date as the arthroscopic surgery, Kramer purportedly issued a prescription in the name of SA for the use of a DVT Device at East Tremont ASC that indicated SA was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

(xv)    On September 12, 2022, an Insured named VB was purportedly involved in a motor vehicle accident. On December 8, 2022, Finuoli performed an arthroscopic procedure on VB's left shoulder at North Shore ASC. On the same date as the arthroscopic surgery, Finuoli purportedly issued a prescription in the name of VB for the use of a DVT Device at North Shore ASC that indicated VB was at risk of developing a DVT.  The prescription was provided to the Defendants and used by the Defendants to bill GEICO.

149. These are only representative samples. In fact, all the Insureds identified in Exhibit "1" received, pursuant to predetermined fraudulent protocols with others who are not presently identifiable, prescriptions for DVT Devices that are identical to the ones identified above and under virtually identical conditions.

150. In further support of the fact that the prescriptions for DVT Devices identified in Exhibit "1" were part of a predetermined fraudulent protocol and not based on medical necessity, multiple Insureds identified in Exhibit "1" were issued <u>two</u> separate prescriptions for the rental of a DVT Device by the Insured while at Global ASC, with both prescriptions issued on the same date and by the same Referring Provider. One prescription was provided to Strac and the other prescription was provided to a different DME supplier.

151. Additionally, and in further support of the fact that the prescriptions for DVT Devices identified in Exhibit "1" were part of a predetermined fraudulent protocol and not based on medical necessity, there was no legitimate medical reason for a Referring Provider to issue <u>two</u> separate prescriptions for the rental of a DVT Device to an Insured for use at Global ASC.

152. For example:

(i)     On November 12, 2021, an Insured named HLS was purportedly involved in a motor vehicle accident. On January 24, 2022, Wanich performed an arthroscopic procedure on HLS's left shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued <u>two separate prescriptions</u> in the name of HLS for the rental of a DVT Device at Global ASC. One prescription was provided to the Defendants and the second prescription was provided to a different DME supplier, and both billed GEICO purporting to provide HLS with a DVT Device at Global ASC.

(ii)    On November 12, 2021, an Insured named LM was purportedly involved in a motor vehicle accident. On February 14, 2022, Wanich performed an arthroscopic procedure on LM's left wrist at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued <u>two separate prescriptions</u> in the name of LM for the rental of a DVT Device at Global ASC. One prescription was provided to the Defendants and the second prescription was provided to a different DME supplier, and both billed GEICO purporting to provide LM with a DVT Device at Global ASC.

(iii)    On November 17, 2021, an Insured named IBC was purportedly involved in a motor vehicle accident. On February 14, 2022, Wanich performed an arthroscopic procedure on IBC's left knee at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued <u>two separate prescriptions</u> in the name of IBC for the rental of a DVT Device at Global ASC. One prescription was provided to the Defendants and the second prescription was provided to a different DME supplier, and both billed GEICO purporting to provide IBC with a DVT Device at Global ASC.

(iv)    On December 4, 2021, an Insured named KR was purportedly involved in a motor vehicle accident. On January 24, 2022, Wanich performed an arthroscopic procedure on KR's right shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued <u>two separate prescriptions</u> in the name of KR for the rental of a DVT Device at Global ASC. One prescription was provided to the Defendants and the second prescription was provided to a different DME supplier, and both billed GEICO purporting to provide KR with a DVT Device at Global ASC.

(v)    On December 28, 2021, an Insured named YY was purportedly involved in a motor vehicle accident. On February 28, 2022, Wanich performed an arthroscopic procedure on YY's left shoulder at Global ASC. On the same date as the arthroscopic surgery, Wanich purportedly issued <u>two separate prescriptions</u> in the name of YY for the rental of a DVT Device at Global ASC. One prescription was provided to the Defendants and the second prescription was provided to a different DME supplier, and both billed GEICO purporting to provide YY with a DVT Device at Global ASC.

153.    These are only representative samples. In fact, many of the Insureds identified in Exhibit "1" who treated at Global ASC received multiple prescriptions for DVT Devices virtually identical to the ones identified above, which were not medically necessary and were issued pursuant to predetermined fraudulent protocols with others who are not presently identifiable.

154.    In reality, for the reasons set forth above, all of the charges for DVT Devices identified in Exhibit "1" were not medically necessary and were provided as part of predetermined fraudulent protocols. As such, the Defendants were never eligible for reimbursement of No-Fault Benefits.

      **F.**    **The Defendants' Inflated Charges to GEICO for DVT Devices and Other DME**

155.    Beyond the fact that the Defendants were not entitled to submit the charges for DME to GEICO, that they were engaged in unlawful financial arrangements, that there was a lack of medical necessity associated with the DVT devices, and that they didn't provide the DVT Devices, the bills submitted to GEICO by the Defendants misrepresented, to the extent that any DVT Devices were actually provided, that the charges for the DVT Devices were for permissible reimbursement rates, when they were not.

156.    When the Defendants submitted bills to GEICO for the rental of DVT Devices, those bills fraudulently misrepresented that the charges for the DVT Devices were for permissible reimbursement rates, when they were not.

157.    When the Defendants submitted bills to GEICO seeking payment for renting DVT Devices under HCPCS Code E0676, the Defendants fraudulently misrepresented that the charges were no greater than the maximum permissible amount.

158.    Under the New York Fee Schedule, the total monthly rental cost for Fee-Schedule items shall not exceed the lower of: (i) the monthly rental charge to the general public; or (ii) the monthly fee permitted under the Medicaid Fee Schedule.

159.    Additionally, DME suppliers are not entitled to separate charges for supplies and services provided in conjunction with the rental of DME.

160.    Regardless of whether DME is provided for patients to keep or rented to patients, the maximum reimbursement rates set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME.

161.    For these charges related to rental cost of Non-Fee Schedule items, the maximum monthly rental cost, as per the New York Fee Schedule, is the monthly cost to the general public

because the New York State Department of Health has not established a price for DME rentals and defers as a matter of policy to the New York State Medicaid Program Durable Medical Equipment Manual Policy Guidelines.

162.    To reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

163.    Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

164.    Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

165.    However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

166.    For dates of service on or after June 1, 2023, Part E of Appendix 17-C of 11 N.Y.C.R.R. 68 establishes calculations for the maximum permissible daily rental rates of Non-Fee Schedule items and the maximum total accumulated charges, as follows:

(d)(1)   On or after June 1, 2023, the maximum permissible monthly rental charge for such durable medical equipment shall be one-tenth the acquisition cost to the

provider.  Rental charges for less than one month shall be calculated on a pro-rated basis using a 30-day month.

(2)    The total accumulated rental charge for such durable medical equipment shall be the least of the:

    (i)    Acquisition cost plus 50%;

    (ii)    Usual and customary price charged by durable medical equipment providers to the general public; or

    (iii)    Purchase fee for such durable medical equipment established in the Official New York Workers' Compensation Durable Medical Equipment Fee Schedule.

167.    In essence, these new calculations establish a daily rental rate for Non-Fee Schedule items at $1/300^{th}$ of the acquisition cost, and establish a maximum total rental reimbursement per patient that is not to exceed the lesser of 150% of the acquisition cost of the item, the usual and customary price charged by other DME providers to the general public, or the purchase fee established in the Fee Schedule.

168.    Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

    (i)    The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

    (ii)    The prescription for DME is not based any unlawful financial arrangement;

    (iii)    The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

    (iv)    The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

    (v)    The fee sought for DME provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item; or

    (vi)    The *pro rata* monthly rental fee sought for renting DME or OD to an Insured was not in excess of the standard for calculating rental reimbursement.

### i.      Inflated DVT Device Charges Prior to June 1, 2023

169.    For dates of service prior to June 1, 2023, HCPCS Code E0676 was a Non-Fee Schedule Code, where the total <u>monthly</u> rental charges for equipment, supplies, and services is no greater than the average monthly cost to the general public.

170.    As set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E0676 for purportedly renting DVT Devices to Insureds – to the extent that the DVT Device was actually provided to Insureds – the Defendants fraudulently misrepresented in the vast majority of bills that they were able to collect $2,995.00 for a 1-day rental of each DVT Device rented to an Insured at a Surgical Center.

171.    In some circumstances, the Defendants fraudulent misrepresented that they were instead entitled to collect either $1,975.00 or $995.00 for a 1-day rental each DVT Device rented to an Insured at a Surgical Center.

172.    Regardless of if the Defendants charged $2,995.00, $1,975.00, or $995.00 these rates submitted by the Defendants for DVT Devices under HCPCS Code E0676 fraudulently misrepresented the maximum reimbursement amount for the rental of the DVT Devices as the cost to the public for the rental of a DVT Device was only a fraction of what was charged to GEICO.

173.    During GEICO's investigation into the Defendants, GEICO was able to determine prices for the rental of DVT Devices that are available for rent to the general public at a fraction of the price the Defendants' charged GEICO.

174.    Although the Defendants charged GEICO either $2,995.00, $1,975.00, or $995.00 per day for each DVT Device rented to Insureds, DVT Devices were available for rent by the general public at drastically lower rates via internet websites, such as through: (i) medcomgroup.com for between $425.00 and $495.00, depending upon the model, for a <u>four-week</u>

rental, which is the equivalent of between $14.17 and $16.50 per day; and (ii) outfrontmedical.com for $175.00 for a four-week rental, which is the equivalent of $5.83 per day.

175.    In all the charges submitted to GEICO for the rental of DVT Devices using HCPCS Code E0676 prior to June 1, 2023, the Defendants fraudulently misrepresented that the maximum reimbursement rate was $2,995.00, $1,975.00, or $995.00 per day when the maximum reimbursement was no greater that the price available to the general public, which is no greater than $16.50 per day.

**ii.    Inflated DVT Device Charges After June 1, 2023**

176.    HCPCS Code E0676 was added to the WC Fee Schedule as of April 4, 2022, with a maximum *purchase price* reimbursement of $604.83.

177.    However, the WC Fee Schedule does not include a listed rental fee for HCPCS Code E0676.

178.    Since the WC Fee Schedule does not include a rental fee for HCPCS Code E0676, then for dates of service on or after June 1, 2023, the maximum permissible monthly rental charge is calculated using one-tenth of the acquisition cost of the DVT Device by the Defendants, with rental charges for less than one month calculated on a pro-rata basis using a 30-day month.

179.    As set forth in Exhibit "1", when the Defendants submitted bills to GEICO using HCPCS Code E0676 for purportedly renting DVT Devices to Insureds on or after June 1, 2023 – to the extent that the DVT Device was actually provided to Insureds – the Defendants fraudulently misrepresented they were able to collect either $1,975.00 or $995.00 per day for each DVT Device rented to an Insured at a Surgical Center.

180.    However, each of these charges submitted by the Defendants for DVT Devices under HCPCS Code E0676 fraudulently misrepresented the maximum reimbursement amount for

the rental of these DVT Devices as the maximum reimbursement rate was only a fraction of what was charged to GEICO.

181.    By submitting a charge of either $1,975.00 or $995.00, the Defendants represented that this charge was the maximum permissible daily rental charge, as calculated using one-tenth of the acquisition cost of the DVT Device by the Defendants pro-rated using a 30-day month to determine the daily rental rate.

182.    A daily rental charge of either $1,975.00 or $995.00 would, by extension, mean the Defendants' acquisition cost for a DVT Device was either $592,500.00 or $298,500.00.

183.    In reality, the Defendants' acquisition cost for a DVT Device was significantly less, with acquisition cost ranging between $1,200.00 and $2,100.00 per DVT Device, depending on the make and model.

184.    For example, Defendants' acquisition cost for a VF Elite System with Battery DVT Device was $2,100.00, making the maximum daily rental rate that could be charged to GEICO and other insurers for this DVT Device $7.00 per day.

185.    Additionally, since the WC Fee Schedule does not include a rental fee for HCPCS Code E0676, the Defendants were required to submit documentation supporting their charges to GEICO, such as an invoice that details the unit cost of the DVT Device, to verify the rate charged to GEICO and other automobile insurers.

186.    However, the Defendants never submitted any documentation to substantiate their charges billed under HCPCS Code E0676.

187.    The Defendants did not include invoices showing their legitimate cost to acquire the DVT Devices in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were drastically less than the charges contained in their bills.

188.    In virtually all of the charges submitted to GEICO for the rental of DVT Devices under HCPCS Code E0676, the Defendants fraudulently misrepresented that the maximum reimbursement rate was either $1,975.00 or $995.00 per day when their maximum reimbursement was only a small fraction of the charge.

189.    Additionally, since the WC Fee Schedule does not include a rental rate for HCPCS Code E0676, the No-Fault regulations establish that total accumulated rental charge shall not exceed the purchase fee established in the WC Fee Schedule.

190.    Regardless of how long the Defendants rented DVT Devices to Insureds, the maximum permissible accumulated (i.e. lifetime) charge that could be billed to GEICO for the rental of a DVT Device under HCPCS Code E0676 was no greater than $604.83, which is the purchase price established in the WC Fee Schedule.

### iii.    Inflated Charges for Other DME Supplied by the Defendants

191.    In addition to submitting hundreds of fraudulent charges for the rental of DVT Devices, the Defendants also fraudulently misrepresented the reimbursement rate for other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

192.    For example, as identified in Exhibit "1," the Defendants regularly submitted charges for $280.00 under HCPCS Code L3660 for purportedly supplying Insureds with a shoulder orthosis.

193.    Unlike the fraudulent charges for $280.00 for each shoulder orthosis billed under HCPCS Code L3660 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a

maximum reimbursement rate of $40.00 for each shoulder orthosis billed under HCPCS Code L3660.

194.    In each of the claims identified within Exhibit "1" where the Defendants billed for shoulder orthoses under HCPCS Code L3660, each of the bills fraudulently misrepresented that the Defendants were entitled to $280.00, when the maximum reimbursement was actually $40.00.

195.    The claims identified in Exhibit "1" for HCPCS Code L1820 is another example of how the Defendants fraudulently misrepresented the Fee Schedule rate for DME purportedly provided to Insureds.

196.    As identified in Exhibit "1," the Defendants submitted charges for $400.00 under HCPCS Code L1820 for purportedly supplying Insureds with a knee orthosis.

197.    Unlike the fraudulent charges for $400.00 for each knee orthosis billed under HCPCS Code L1820 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $110.00 for each knee orthosis billed under HCPCS Code L1820.

198.    In each of the claims identified within Exhibit "1" where the Defendants billed for knee orthoses under HCPCS Code L1820, each of the bills fraudulently misrepresented that the Defendants were entitled to $400.00, when the maximum reimbursement was actually $110.00.

199.    The claims identified in Exhibit "1" for HCPCS Code L3670 is another example of how the Defendants fraudulently misrepresented the Fee Schedule rate for DME purportedly provided to Insureds.

200.    As identified in Exhibit "1," the Defendants submitted charges for $400.00 under HCPCS Code L3670 for purportedly supplying Insureds with a shoulder orthosis.

201.    Unlike the fraudulent charges for $400.00 for each shoulder orthosis billed under HCPCS Code L3670 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $111.07 for each shoulder orthosis billed under HCPCS Code L3670.

202.    In each of the claims identified within Exhibit "1" where the Defendants billed for shoulder orthoses under HCPCS Code L3670, each of the bills fraudulently misrepresented that the Defendants were entitled to $400.00, when the maximum reimbursement was actually $111.07.

203.    The claims identified in Exhibit "1" for HCPCS Code E0100 is another example of how the Defendants fraudulently misrepresented the Fee Schedule rate for DME purportedly provided to Insureds.

204.    As identified in Exhibit "1," the Defendants submitted charges for $40.00 under HCPCS Code E0100 for purportedly supplying Insureds with a cane.

205.    Unlike the fraudulent charges for $40.00 for each cane billed under HCPCS Code E0100 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $12.00 for each cane billed under HCPCS Code E0100.

206.    In each of the claims identified within Exhibit "1" where the Defendants billed for canes under HCPCS Code E0100, each of the bills fraudulently misrepresented that the Defendants were entitled to $40.00, when the maximum reimbursement was actually $12.00.

### III.    The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

207.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the name of Strac, seeking payment for DVT Devices.

208.    The NF-3 forms or HCFA-1500 forms that the Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)     The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided DME pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of DME, they were not properly licensed by the City of New York as they failed to obtain a Dealer in Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that Defendants provided DVT Devices pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, the Defendants never provided any of the DVT to Insureds.

(iii)   The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided DME pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any DME, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; and (b) predetermined fraudulent protocols without regard for the medical necessity of the items.

(iv)    The NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions uniformly misrepresented to GEICO the proper reimbursement amount for DME provided to the Insureds, to the extent that the Defendants provided any DME, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent any DME was provided – the bills falsified that the charges to GEICO were less than or equal to the maximum permissible reimbursement amount for the DME identified in the NF-3 forms, HCFA-1500 forms, treatment reports, and prescriptions.

**IV.**      **The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

209.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

210.    To induce GEICO to promptly pay the fraudulent charges for the DME, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

211.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring Strac to obtain a Dealer in Products License because they never sought to obtain a license, and concealed this misrepresentation in order to submit bills to GEICO and prevent GEICO from discovering that the DME were billed to GEICO for financial gain.

212.    The Defendants also knowingly misrepresented and concealed that the prescriptions for DVT Devices were not based upon medical necessity but rather were based upon predetermined fraudulent protocols as a result of unlawful financial arrangements, were provided to Strac, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that DVT Devices were billed to GEICO for financial gain.

213.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for DVT Devices were based upon predetermined protocols and without medical necessity in order to prevent GEICO from discovering that DVT Devices were billed to GEICO for financial gain.

214.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the DME contained in the bills submitted by Strac to GEICO in order to prevent GEICO from discovering that DVT Devices and other DME were billed to GEICO for financial gain.

215.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

216.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for an verification and an examination under oath with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

217.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

218.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $595,000.00 based upon the fraudulent charges.

219.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**<u>FIRST CAUSE OF ACTION</u>**
**Against Strac**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

220.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

221.    There is an actual case in controversy between GEICO and Strac regarding more than $1,600,000.00 in fraudulent billing that has been submitted to GEICO in the name of Strac.

222.    Strac has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for DME were based – not upon medical necessity but – as a result of its participation in unlawful financial arrangements.

223.    Strac has no right to receive payment for DVT Devices because it never provided DVT Devices to Insureds, which were instead provided by the Surgical Centers without any interaction or involvement by Strac and the fees for the use of DVT Devices were already included as part of the fees charged by the Surgical Center to GEICO.

224.    Strac has no right to receive payment for any pending bills submitted to GEICO because Strac did not comply with all local licensing laws as it failed to obtain a Dealer in Products License, and thus, was not properly lawfully licensed by the City of New York as required by the local regulations.

225.    Strac also has no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, and others who are not presently known, rather than to treat the Insureds.

226.    Strac has no right to receive payment for any pending bills submitted to GEICO because – to the extent that Strac provided any DVT Devices or other DME – Strac fraudulently misrepresented that the charges for DVT Devices or other DME contained within the bills were less than or equal to the maximum permissible reimbursement amount under the No-Fault Laws.

227.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Strac has no right to receive payment for any pending bills submitted to GEICO under the name of Strac.

## SECOND CAUSE OF ACTION
### Against DeVries and Cuomo
### (Violation of RICO, 18 U.S.C. § 1962(c))

228.     GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

229.     Strac is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

230.     DeVries and Cuomo knowingly conducted and/or participated, directly or indirectly, in the conduct of Strac's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Strac was not eligible to receive under the New York No-Fault Laws because: (i) Strac was not properly licensed as it failed to obtain a Dealer in Products License required by regulations from the City of New York; (ii) Strac submitted bills to GEICO for DVT Devices and other DME that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii)  Strac submitted bills to GEICO for DVT Devices it never provided to Insureds, as the DVT Devices were instead provided by the Surgical Centers without any interaction or involvement by Strac and the fees for the use of DVT Devices were already included as part of the fees charged by the Surgical Center to GEICO; (iv) Strac submitted bills to GEICO for DVT Devices that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical

necessity – that are solely to financially enrich the Defendants and others who are not presently known; and (v) to the extent that Strac actually provided DVT Devices and other DME to the Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the DVT Devices and other DME. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

231.    Strac's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which DeVries and Cuomo operate Strac, insofar as Strac is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Strac to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that DeVries and Cuomo continue to submit and attempt collection on the fraudulent billing submitted by Strac to the present day.

232.    Strac is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Strac in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

233.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $595,000.00 pursuant to the fraudulent bills submitted through Strac.

234.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against DeVries, Cuomo, and John Doe Defendants 1-10**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

235.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

236.    Strac is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

237.    DeVries, Cuomo, and John Doe Defendants 1-10 are owners of, employed by, or associated with the Strac enterprise.

238.    DeVries, Cuomo, and John Doe Defendants 1-10 knowingly have agreed, combined, and conspired to conduct and/or participate, directly or indirectly, in the conduct of Strac's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over two years seeking payments that Strac was not eligible to receive under the New York No-Fault Laws because: (i) Strac was not properly licensed as it failed to obtain a Dealer in Products License required by regulations from the City of New York; (ii) Strac submitted bills to GEICO for DVT Devices and other DME that it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii)  Strac submitted bills to GEICO for DVT Devices it never provided to Insureds, as the DVT Devices were instead provided by the Surgical Centers without any interaction or involvement by Strac, and the fees for the use of DVT Devices were

already included as part of the fees charged by the Surgical Center to GEICO; (iv) Strac submitted bills to GEICO for DVT Devices that it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity – that are solely to financially enrich the Defendants and others who are not presently known; and (iv) to the extent that Strac actually provided DVT Devices and other DME to Insureds, the bills to GEICO fraudulently mischaracterized the permissible reimbursement amount for the DVT Devices and other DME. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

239.    DeVries, Cuomo, and John Doe Defendants 1-10 knew of, agreed to, and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

240.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $595,000.00 pursuant to the fraudulent bills submitted through Strac.

241.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Strac, DeVries, and Cuomo
### (Common Law Fraud)

242.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

243.     Strac, DeVries, and Cuomo intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for DVT Devices and other DME.

244.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Strac was in compliance with all laws and regulations and was entitled to No-Fault Benefits when in fact Strac was not lawfully licensed as required by New York City regulations as it failed to obtain a Dealer in Products License; (ii) in every claim, that the prescriptions for DVT Devices and other DME were for reasonable and medically necessary DME when in fact the prescriptions were provided as a result of unlawful financial arrangements and not based upon medical necessity, which were used to financially enrich those that participated in the scheme; (iii)  in every claim, that Strac provided DVT Devices to Insureds when in fact DVT Devices were instead provided by the Surgical Centers without any interaction or involvement by Strac and the fees for the use of DVT Devices were already included as part of the fees charged by the Surgical Center to GEICO; (iv) in every claim, that the prescriptions for DVT Devices were for reasonable and medically necessary DME when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; and (v) in every claim, to the extent that DVT Devices and other DME was actually provided, the charges for DVT Devices and other DME contained in the bills to GEICO misrepresented the permissible reimbursement amount.

245.     Strac, DeVries, and Cuomo intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Strac that were not compensable under the No-Fault Laws.

246.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $595,000.00 pursuant to the fraudulent bills submitted by the Defendants through Strac.

247.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

248.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Strac, DeVries, and Cuomo
### (Unjust Enrichment)

249.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

250.    As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

251.    When GEICO paid the bills and charges submitted by or on behalf of Strac for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

252.    The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

253.    Strac' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

254.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $595,000.00.

## JURY DEMAND

255.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against Strac, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Strac has no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against DeVries and Cuomo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $595,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against DeVries, Cuomo, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $595,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Strac, DeVries, and Cuomo, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $595,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

E.      On the Fifth Cause of Action against Strac, DeVries, and Cuomo, more than $595,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: March 6, 2024
       Uniondale, New York

RIVKIN RADLER LLP

By:__ */s/ Barry I. Levy* _____
       Barry I. Levy (BL 2190)
       Michael A. Sirignano (MS 5263)
       Michael Vanunu (MV 4167)
       Philip P. Nash (PN 0519)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*

57